UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RICKEY D. PARR, ET AL. | CIVIL ACTION |
| VERSUS | NO. 13-6242 |
| ALLSTATE INSURANCE COMPANY | SECTION "L" (3) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### I. PROCEDURAL HISTORY

This action arises out of a flood insurance claim made by Plaintiffs Rickey and Laurie Parr[1] against their Write-Your-Own flood insurer, Allstate Insurance Company, for damage to their house sustained during Hurricane Isaac.

On October 24, 2013, the Parrs brought a complaint alleging that Allstate breached the insurance contract and failed to tender payment for losses covered under that contract. (Rec. Doc. 1). Specifically, the Parrs sought reimbursement for those losses, court costs, and any other fair and equitable relief. *Id*. In its answer, Allstate denies the allegations and asserts various affirmative defenses. (Rec. Doc. 5).

This matter came to trial before the Court without a jury on September 22, 2014. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the memoranda submitted by the parties, the Court now makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such; to the extent that a conclusion of law constitutes a finding of fact, the Court also adopts that as such.

---
[1] Mrs. Parr is now deceased. This action continues regardless, however, as Mr. Parr is also an insured. *See* Fed. R. Civ. Pro. 25.

## II.   FINDINGS OF FACT

This action arises out of damage caused by Hurricane Isaac. The Parrs held a standard flood insurance policy ("SFIP") with Defendant Allstate, providing property coverage on their home in LaPlace, Louisiana, up to $210,000 and contents coverage up to $44,100, each subject to a $1,000 deductible.[2]

On or about August 29, 2012, Hurricane Isaac caused flood damage to the insured house. The interior of the insured home filled with 6-7 inches of water. The water remained several days before it subsided. In early September 2012, the Parrs called to notify Allstate of the flood damage. On September 11, 2012, Allstate sent an independent adjuster, Scott Richards of Pilot Catastrophe Services, to inspect the insured dwelling. Shortly thereafter, the Parrs hired a public adjuster, Michael Michio of ProClaim, to assess the flood damage. Mr. Michio inspected the property in mid-September 2012 and shortly thereafter issued a report estimating the replacement cost value of the dwelling at $134,294.84. Mr. Michio based his estimate on local pricing of construction goods and services in New Orleans, Louisiana. Mr. Michio assisted the Parrs in drafting a proof of loss in the amount of $159,555.36. Mr. Parr signed the proof of loss and submitted it to Allstate on October 29, 2012.

On September 30, 2012, Mr. Richards submitted his estimates: building damage with a replacement cost value ("RCV") of $83,691.39 and an actual cash value ("ACV") of $77,017.01. Based on Mr. Richard's estimate, Allstate paid the Parrs $77,819.61 for building damage (along with $44,100 for contents damage).

---

[2] As Allstate has paid contents damage to the Parrs up to the policy limits, the Court will not discuss the issue of contents coverage.

Mr. Parr largely left the home in its unrepaired state. Immediately following the storm, Mr. Parr and his family removed the furnishings from the home. Mr. Parr purchased several dehumidifiers to help dry out the home. He also opened all the windows and used fans to help dry the interior. Mr. Parr began to gut the home by cutting one-foot holes in the drywall and removing the blow-in insulation from behind the walls. At that point, Mr. Parr "gave up" and ceased any further attempts at remediation. Mrs. Parr died in February 2014, and in March 2014 Mr. Parr sold the home for $150,000 in its unrepaired state. Apparently, Mr. Parr originally had purchased the home for $150,000. Although the home was appraised in 2008 for $268,000 to $278,000, the Parrs put the house on the market in 2008 but were unable to sell it. Mr. Parr testified that he decided to sell the unrepaired home in March 2014 because he was too mentally and physically tired and because he felt that he could not repair the home for the amount he received from Allstate. According to his testimony, Mr. Parr loved the home, as did his family, but he no longer needed the space and moved into a condo.

At trial, the parties presented largely conflicting expert testimony. The Court qualified Mr. Parr's property damage causation and cost estimate expert, Mr. Michio, under Federal Rule of Evidence 702, noting his expertise by training, education, and experience. The Court also qualified Allstate's expert, John Crawford, as an expert in construction and forensic / structural engineering. The experts testified regarding their own expert reports and the expert report of their opposing counterpart. Both experts agreed on several issue: (1) Hurricane Isaac caused damage throughout the home, and (2) Xactimate is industry-standard software and it is appropriate for obtaining flood remediation estimates using September/October 2012 local pricing in New Orleans, Louisiana. Moreover, both experts' estimates include a 10% profit and 10% overhead for a general contractor. Such cost was not incurred by the Parrs since they did not

use a general contractor and had no reasonable likelihood to use a general contractor because the house was sold unrepaired for its purchase price. The experts disagreed about whether specified items required replacement, and about general methodology.

Upon consideration of the evidence, the Court finds Mr. Crawford's expert opinion more persuasive than that of Mr. Michio. Notably, Mr. Crawford provided specific, compelling critiques of Mr. Michio's methodology, while Mr. Michio largely only provided general, unsubstantiated criticism of Mr. Crawford's analysis. Moreover, Mr. Crawford has a more accurate ACV analysis: he provided a line-by-line analysis of the depreciation of each item, taking into consideration each item's age and condition. By contrast, Mr. Michio did not initially include an ACV estimate; he later provided one at trial simply by deducting a fixed percentage from his total RCV estimate.

Although Mr. Crawford's analysis is tempered by the fact that he visited the insured home for the first, and last, time on August 21, 2014, more than a year and half after the hurricane damage occurred, his assessment of the required repairs is nonetheless convincing. He explained various flaws and overestimates in the analysis of Mr. Michio. For example, Mr. Crawford explained that Mr. Michio's estimate provided for full wall replacement costs (including drywall installation, painting, and finishing) for parts of rooms which did not contain wall space – such as window breaks and entry ways. This flaw substantially undermines the value of Mr. Michio's estimate. Moreover, Mr. Crawford's credible testimony explained that Mr. Michio, in part: (1) estimated drywall expenses that were approximately double the actual cost, (2) seemingly manually overrode the Xactimate software improperly on various estimates, and (3) improperly contained estimates for unnecessary repairs. The Court is thus persuaded that Mr.

Mr. Crawford's analysis, with the modifications discussed herein, provides the proper benchmark for the Court's analysis.

Although, generally, Mr. Crawford accurately estimated ACV, Mr. Michio's analysis shows that Mr. Crawford provided for underpayment in several respects. First, although the evidence does not indicate that the house's electrical system was damaged, safety concerns nonetheless permit recovery for testing by a licensed electrician. Mr. Michio's estimate of eight hours for an electrician's services are too high, however – the Court will permit four hours of electrician testing, which comes to $345.20. Second, it is reasonable to allow recovery for the bagging and proper removal of items waterlogged with category 3 water, which comes to $5,000.[3] Third, it is reasonable to replace the solid wood doors throughout the home, which comes to $4,461.11. These repair costs, totaling $9,806.31, must be added to Mr. Crawford's estimate, subject to the profit and overhead deduction explained in the Conclusions of Law.

## III.   CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 4072 as well as 28 U.S.C. § 1331, § 1332, and § 1337.  SFIPs are governed by statute, FEMA regulations, and federal common law. *Wright v. Allstate Ins. Co.*, 415 F.3d 384, 390 (5th Cir. 2005). Any interpretation of those regulations by FEMA also governs, as long as that interpretation is not inconsistent with the regulations or plainly erroneous. *Worthen v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 463 F. App'x 422, 426 (5th Cir. 2012) (citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)). SFIPs must be "'strictly construed and enforced.'" *Id.* (quoting *Gowland v. Aetna*, 143 F.3d 951, 954 (5th Cir.1998)). "In addition, the insured is charged with

---

[3] The Court came to this number, first, by utilizing Mr. Michio's estimates for tearing out and bagging items. However, that total, $7,697.89, is too high because the unbagged removal of many of these items is already provided for in Mr. Crawford's estimate. As such, the Court reduces this figure to $5,000, a more appropriate number for bagged removal.

constructive knowledge of the policy provisions and of the NFIP . . . 'regardless of actual knowledge of what is in the [r]egulations or of the hardship resulting from innocent ignorance.'" *Id*. (quoting *Fed. Crop. Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) (alteration in original)). Although federal law governs SFIPs, "general principles of state insurance law may be useful" in interpreting them. *Id.* at 425.

As a threshold matter, it is undisputed that the Parrs provided Allstate with timely notice of their SFIP claim. Therefore, the Parrs have sufficiently met the notice requirements of the policy and are not barred from additional payment under the SFIP. *Gowland*. 143 F.3d at 954; *see also Copeland v. Fed. Emergency Mgmt. Agency*, No. 03–2704, 2004 WL 325577, at *1, *3 (E.D. La. Feb. 18, 2004) (Barbier, J).

The SFIP issued to the Parrs by Allstate provides several different methods of settling losses: the RCV approach and the ACV approach.[4] The SFIP provides:

> The following loss settlement conditions apply to a single-family dwelling . . . :
>
> (a) [The insurer] will pay to repair or replace the damaged dwelling after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
>     (1) The building limit of liability . . . ;
>
>     (2) The replacement cost of that part of the dwelling damaged, with materials of like kind and quality and for like use; or
>
>     (3) The necessary amount actually spent to repair or replace the damaged part of the dwelling for like use.
>
>     . . . .
>
> (c) When the full cost of repair or replacement is more than $1,000, or more than 5% of the whole amount of insurance that applies to the

---

[4] Customarily, the ACV approach allowed immediate payment regardless of whether repairs had been made or would be made, whereas the replacement cost approach allowed payment only after repairs had actually been made. *See Need for Replacement to Actually Be Made*, 12 COUCH ON INS. § 176:59 (3d ed.). Stated differently, the ACV approach is unlike the RCV approach because it "makes the insured responsible for bearing the cash difference necessary to replace old property with new property." *Introduction; Types of Provisions*, 12 COUCH ON INS. § 176:56 (3d ed.). Further, the replacement cost may well exceed the actual cash value. *Id*.

>     dwelling, [the insurer] will not be liable for any loss under
>     [subsection (a)] above . . . unless and until actual repair or
>     replacement is completed.
>
> (d) [The insured] may disregard the replacement cost conditions above
>     and make claim under this policy for loss to dwellings on an actual
>     cash value basis. [The insured] may then make claim for any
>     additional liability according to [subsections (a) and (c)] above,
>     provided [the insured] notif[ies the insurer] of [their] intent to do
>     so within 180 days after the date of loss.

*Id*. art. VII(V)(2)(a)-(d). Here, the parties agree that the Parrs' claim is subject to an ACV analysis.

ACV means "the cost to replace an insured item of property at the time of loss, less the value of its physical depreciation." 44 C.F.R. pt. 61, app. A(1), art. II(B)(2). Courts often use an expert's estimate to determine ACV, supplementing the ACV analysis by consideration of any actual expenses incurred to ensure the validity of that estimate. *See Stevens v. Allstate Ins. Co.*, 13-5102, 2014 WL 2882957, at *4 (E.D. La. 2014) (Fallon, J.). The Court uses Mr. Crawford's estimate as the benchmark, with the modifications explained in the Court's Findings of Fact. The fact that the Parrs' house remains in an unrepair state heightens the need for an ACV analysis based on an expert estimate, as opposed to actual repair expenses. Mr. Crawford sets the ACV at $77,235.51, including general overhead and profit in the amount of $12,833.72.

Under Fifth Circuit SFIP case law directly on point, ACV reimbursement here does not include general overhead and profit. "Overhead and profit is a pass-through cost intended to reimburse homeowners for the expense of using a general contractor. Since the [insureds] sold their home unrepaired, they never incurred and will never incur the cost of a general contractor. They are not entitled to overhead and profit." *Dwyer v. Fid. Nat. Prop. And Cas. Ins. Co.*, 428 F. App'x 270, 271 (5th Cir. 2011); *see also Stevens*, 2014 WL 2882957, at *4 (holding that the insureds were not eligible to receive reimbursement for a general contractor because they did not

hire a contractor). In line with its *Stevens* ruling, this Court is bound to follow the Fifth Circuit's holding which requires denial of reimbursement for overhead and profit under these same circumstances. *Dwyer*, 428 F. App'x at 271. The Court notes, however, that there is a plausible counterargument that might allow for overhead and profit reimbursement in some situations. Both the Sixth and Eleventh Circuits have required reimbursement for overhead and profit for non-NFIP insurance contracts, reversing the respective district courts on the issue. *Mills v. Foremost Insurance Co.*, 511 F.3d 1300, 1306 (11th Cir. 2008); *Parkway Associates, LLC v. Harleysville Mutual Insurance Co.*, 129 Fed. App'x 955, 962-63 (6th Cir. 2006); *see also Worthen*, 463 F. App'x 422, 426 (explaining that "general principles of state insurance law may be useful" in interpreting the SFIP). In contrast to the Fifth Circuit's analysis in *Dwyer*, which focuses on whether the homeowner *actually used* (or intended to use) a general contractor, the Sixth and Eleventh Circuits instead focus on whether the scope of the work is such that an insured would be *reasonably likely* to use a general contractor to perform the work. The Eleventh Circuit suggests that a majority of courts have followed this approach. *Mills*, 511 F.3d at 1306. Moreover, the Sixth Circuit explains that the focus remains on whether a general contractor is reasonably required for the scope of the work and actual use is immaterial: "even if Parkway [the insured] chooses not to repair its property at all, it would still be entitled to what it bargained for: the actual cash value of its loss, which includes contractor's overhead and profit where a contractor would reasonably be utilized to make repairs." *Parkway*, 129 Fed. App'x 955, 962-63. Under the "reasonable use" test, the scope and type of repairs required, rather than the actual use (or nonuse) of a general contractor, is the deciding factor in determining whether it is appropriate to include overhead and profit in regard to a general contractor. *Cf.* 44 C.F.R. pt. 61, app. A(1), art. II(B)(2) (defining "actual cash value"). This test seems particularly appropriate in situations

where a court's SFIP reimbursement analysis necessarily must focus on an expert's estimate rather than actual costs incurred. Although the facts here bind this Court to follow *Dwyer*, the issue might be worth revisiting on appeal or in another case.

Since the Court must deduct $12,833.72 in overhead and profit from Mr. Crawford's estimate, and this number is greater than the $9,806.31 in additional allowances noted in the Findings of Fact, the Parrs are therefore not entitled to any additional compensation from Allstate.

### IV.   SUMMARY

On the basis of the above findings of fact and conclusions of law, the Court finds that the Parrs are not entitled to further payment under the SFIP. Accordingly, **IT IS ORDERED** that their claims be **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 14th day of October, 2014.

_____
UNITED STATES DISTRICT JUDGE